UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
-------------------------------------------------------
                                                :
UNITED STATES OF AMERICA        :
                                                : CASE NO. 1:09-CR-77
            Plaintiff,                      :
                                                :
vs.                                            : OPINION & ORDER
                                                : [Resolving Doc. Nos. 21, 22.]
JAMES W. SMITH                     :
                                                :
            Defendant                   :
                                                :
-------------------------------------------------------

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

On February 10, 2009, the grand jury indicted Defendant James W. Smith, who had previously been convicted of a felony, on one count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). [Doc. 1.] On March 27, 2009, Defendant Smith filed a motion to suppress evidence and statements. [Doc. 21.] On March 29, 2009, Plaintiff United States of America opposed the motion. [Doc. 22.] On March 30, 2009, this Court held a hearing regarding the Defendant's motion to suppress. For the following reasons, the Court hereby **DENIES** Defendant Smith's motion to suppress evidence and statements.

**I. Background**

On January 20, 2009, Defendant James W. Smith was involved in an argument with Shaquana Banks in the public courtyard of the Cleveland Metropolitan Housing Authority ("CMHA") unit located at 2706 Cedar Avenue in Cleveland, Ohio. While monitoring the video feed from surveillance cameras, Sergeant Drew of the CMHA police department saw the argument taking place between

Case No. 1:09-CR-77
Gwin, J.

the Defendant and Banks. The video feed had no accompanying sound. Sergeant Drew testified that he believed that a domestic dispute was taking place. Sergeant Drew then ordered that several officers be sent to the area; the initial street address given by the dispatcher was incorrect, however, and the responding officers spread out to find the correct location. In sending the officers to the scene, Sergeant Drew did not tell them that there was a physical fight taking place; instead, he said that it appeared that "the male is not letting the female go."

As the responding officers searched for the correct location, Sergeant Drew continued to monitor the video and observed Banks attempting to walk away from Defendant Smith several times during their interaction. Each time, the Defendant would prevent Banks from leaving or from walking around him by physically grabbing her arm or her clothing. Sergeant Drew provided a description of the Defendant to the responding officers over the portable radio and also informed them that the Defendant was not letting the woman seen in the video feed leave the area.[1]

Detective Ovalle and Officer Gomillion responded to the area on foot. When they looked through a ground-level corridor, they saw Defendant Smith speaking with Banks. As they walked towards the Defendant, he appeared to look up and to make eye contact with the officers. At this point, the Defendant stopped arguing with Banks and both of them began to walk directly away from the officers and toward a third individual, a woman, who had seemingly been waiting for the couple. At the time Smith saw Detective Ovalle and Officer Gomillion, they were "approximately 50 to 70 yards [away from him] at the most."

---

[1] The area in question was known to the responding officers to be a high crime area. In the month prior to this incident, there had been more than 20 armed robberies in which firearms were brandished. Shootings occur often and homicides have taken place in the area. Both the sale and the use of narcotics are common in the immediate vicinity of this location and concealed firearms are frequently recovered from suspects.

Case No. 1:09-CR-77
Gwin, J.

Smith, Banks, and the woman walked at a calm pace and without any apparent urgency. Banks moved without any apparent coercion from the Defendant. Smith testified that the woman had been present to accompany he and Banks to a laundry and had stood nearby while the couple argued in the courtyard. Detective Ovalle and Officer Gomillion followed the three individuals.

As Defendant Smith, Banks, and the woman walked out of sight around the corner of 2704 Cedar Avenue, Detective Ovalle and Officer Gomillion ran after them. Roughly 14 seconds passed between the time that Smith, Banks and the woman turned the corner and the time that the officers were able to reach the same location. After turning the corner, the officers say that Defendant Smith was standing in the courtyard and receiving apartment keys from Banks. Smith denies this and says that he went immediately to the door leading to a stairwell up to the apartment in which Smith was staying with Banks.

Detective Ovalle testified that after turning the corner, he came upon Defendant Smith, Banks and the woman in the courtyard outside the 2702 Cedar Avenue apartment building. Ovalle testified somewhat inconsistently on direct examination. He first testified that when he turned the corner: "Once [Smith] saw us he began to run. [] He ran northbound to the three story walkup. [] *When he got to the door he entered inside we demanded him to stop* but he kept giving verbal demands for him to stop and we went behind him." Ovalle then seemed to contradict this testimony. In response to the question "Where were you when you first ordered the defendant to stop, then?," he stated "[b]reaking around the corner, right there."

Following this testimony, Detective Ovalle seemed to clarify his testimony on whether the command to stop was given before, or after, Smith supposedly ran to the apartment building: "The demands that were given to the defendant were *given when I had broken the corner* right by 2702

-3-

Case No. 1:09-CR-77
Gwin, J.

Cedar. [] That is exactly correct. Once he obtained the keys from the female, that's when the demand was given to stop. [] The command to stop was given once he obtained the keys, saw us and began to run quickly, that's when the command was given."

Additionally, although he contended that Defendant Smith was flat-footed when Detective Ovalle turned the corner running, Detective Ovalle said that by the time he entered the apartment building he was not able to see Smith "until I went to the third floor."

Detective Ovalle's testimony on this issue is unpersuasive. First, had Defendant Smith been standing in the apartment courtyard when Detective Ovalle ran around the corner, it is not plausible that Smith, given his size, could dash to the apartment building door sufficiently quickly so as to be out of sight when Detective Ovalle entered the building. Even accepting Detective Ovalle's testimony that Smith was standing in the courtyard, both Detective Ovalle and Smith would be only steps from the door. Second, Detective Ovalle never recorded in the police report the fact that he had commanded Smith to stop and the fact that Smith's purported response was to run away.[2] If such a command had been given and Smith had refused the command, it is extremely unlikely that the report would not mention it. The same report also makes no mention of the other woman who was waiting for Smith and Banks. Smith argues that the report says nothing of the woman because that woman had walked ahead to a car and Detective Ovalle never saw the woman before going into the apartment building. Given the importance of the woman as a witness to Smith's claimed disregard of the order to stop, it is not credible that Detective Ovalle ordered Smith, Banks and the woman to stop and then neglected to mention the woman in his report.

---

[2] The police report also said that Smith and Banks appeared "to be in a physical fight" though [t]here was no physical fight, no." No evidence supports the notion that Smith struck Banks.

-4-

Case No. 1:09-CR-77
Gwin, J.

Third, the distance is small from the courtyard to the door of the apartment building located at 2702 Cedar Avenue. Detective Ovalle was 14 seconds behind Smith. Knowing that he had a gun in his pants and knowing that police officers were closing the 50 to 70 yard distance separating them, Smith most likely went immediately to the door of the building and started up the stairs, rather than standing in the courtyard.

Defendant Smith ran up the stairs of the apartment building. Detective Ovalle and Officer Gomillion ran up the stairs behind Smith. At the top of the stairs, the officers saw the Defendant on the top landing trying to use a set of keys to access apartment 144. As Detective Ovalle approached the Defendant, the Defendant reached for his waistband. Fearing for his safety, Detective Ovalle grabbed the Defendant and Officer Gomillion assisted in handcuffing the Defendant.

At this time, Banks was in the stairwell behind the officers yelling at them. Although he testified that he did not have probable cause to arrest Smith and, instead, only sought to conduct investigatory questioning, Detective Ovalle neither patted Smith down nor questioned him. Instead, Detective Ovalle and Officer Gomillion immediately took Defendant Smith downstairs and outside before they conducted a pat-down of the Defendant. Although Smith had been handcuffed, Gomillion testified that he did not intend to arrest Smith, only to make an inquiry. And although Smith may have patted his belt area when Detective Ovalle approached him from behind, Detective Ovalle testified that he thought it safer to delay frisking Smith until Smith could be taken outside. While Detective Ovalle and Officer Gomillion walked the Defendant down the stairs, Smith spontaneously stated that Banks was his fiancé and that they had only been involved in a verbal argument.

Once outside, Detective Ovalle began to conduct a pat-down of Defendant Smith's outer clothing. Detective Ovalle first patted down the area of the Defendant's waistband for which

Case No. 1:09-CR-77
Gwin, J.

Detective Ovalle had seen the Defendant reach and immediately felt an object consistent with the size, weight, and shape of a handgun through the Defendant's clothing. Once he removed the object, Detective Ovalle determined it to be a Springfield Armory Champion .45 caliber handgun with four (4) live .45 caliber rounds in the magazine.

After he obtained the handgun from Defendant Smith, Detective Ovalle advised the Defendant of his *Miranda* rights, which the Defendant apparently waived. The Defendant then stated that he had purchased the gun from an unknown "crack head" for $50.00 around the Cuyahoga Community College area. The Defendant also stated that he lived with Banks and that the couple had been arguing about the Defendant not being involved in laundry chores. Finally, the Defendant stated that Banks handed her apartment keys to the Defendant when he saw the officers following him.

## II. Legal Standard

*A. The Exclusionary Rule*

The Fourth Amendment guarantees

> [t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. amend. IV.

The exclusionary rule was adopted to effectuate the Fourth Amendment right of all citizens to be secure in their persons, houses, papers and effects and to be free from unreasonable searches and seizures. Under this rule, evidence obtained in violation of the Fourth Amendment cannot be used against a defendant in a criminal proceeding. *Mapp v. Ohio*, 367 U.S. 643 (1961); *Wong Sun v.*

Case No. 1:09-CR-77
Gwin, J.

*United States*, 371 U.S. 471, 485 (1962) ("The exclusionary rule has traditionally barred from trial physical, tangible materials obtained either during or as a direct result of an unlawful invasion.").

"[T]he exclusionary rule reaches not only primary evidence obtained as a direct result of an illegal search or seizure, . . . but also evidence later discovered and found to be derivative of an illegality or 'fruit of the poisonous tree.'" *Segura v. United States*, 468 U.S. 796, 804 (1984) (citations omitted). The exclusionary rule extends to the point at which the connection between the illegal search and seizure and the derivative evidence "may have become so attenuated as to dissipate the taint." *Nardone v. United States*, 308 U.S. 338, 341 (1939); *see also United States v. Vasquez*, 638 F.2d 507, 527 (2d Cir. 1980) (holding that "suppression is required of any items seized during the search of the house, unless the taint of the initial entry had been dissipated before the 'consents' to search were given").

*B. Custodial Interrogation*

The Fifth Amendment prohibits authorities from compelling any person "in any criminal case to be a witness against himself." U.S. CONST. amend. V. Consistent with the Fifth Amendment's privilege against self-incrimination, a suspect may not be subject to a custodial interrogation until after being advised of his *Miranda* rights. *United States v. Salvo*, 133 F.3d 943, 948 (6th Cir. 1998). Custodial interrogations include "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). A suspect is in custody if, under the totality of the circumstances, a reasonable person would not have felt free to terminate the encounter and leave. *Yarborough v. Alvarado*, 541 U.S. 652, 663-65 (2004).

Case No. 1:09-CR-77
Gwin, J.

*C.* Terry *Stops*

Under *Terry v. Ohio*, 392 U.S. 1 (1968), a police officer whose observations lead him to reasonably suspect that a particular individual has committed, is committing, or is about to commit a crime may detain that person briefly in order to investigate the circumstances that provoked suspicion. 392 U.S. at 21-22, 30; *see also Delaware v. Prouse*, 440 U.S. 648 (1979). Police officers can make an investigatory stop if they have reasonable, articulable suspicion that a person is engaged in criminal activity. *Terry*, 392 U.S. at 21 Generalized suspicions are insufficient. When police reasonably suspect that a person is engaged in criminal activity, police may stop that person, question him for a limited period of time, and frisk him for weapons. To proceed from a stop to a frisk, the police officer must reasonably suspect that the person stopped is armed and dangerous. *Arizona v. Johnson*, 129 S.Ct. 781, 784 (2009).

"Reasonable suspicion" is a less stringent standard than probable cause, but must be supported by specific and articulable facts. The presence of an individual in a dangerous or a high crime area will not, alone, justify a *Terry* stop, but it is a factor that law enforcement can consider in evaluating the existence of reasonable suspicion. *See Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) ("[O]fficers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation."). Further, "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion. Headlong flight – wherever it occurs – is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such." *Id.* (citations omitted).

Overall, "the determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior," *id.* at 125, and the facts and circumstances giving

-8-

Case No. 1:09-CR-77
Gwin, J.

rise to reasonable suspicion are to be "seen and weighed not in terms of library analysis but as understood by those versed in law enforcement," *United States v. Cortez*, 449 U.S. 411, 418 (1981). In evaluating the validity of a *Terry* stop, a court must consider "the totality of the circumstances." *Id.* at 417.

### III. Analysis

Although the police officers did not have any reasonable suspicion to investigate Defendant Smith outside the apartment building, Smith's motion to suppress fails because at the time that the officers actually "seized" the Defendant, they had the reasonable suspicion necessary to conduct the *Terry* stop – the fruit of which were the handgun found on the Defendant's person and the statements he made to the officers. The officers also did not exceed their authority under *Terry* by handcuffing the Defendant and by moving him downstairs to conduct a pat-down. As a result, the Court denies the Defendant's motion to suppress.

*A. Reasonable Suspicion Supporting the* Terry *Stop*

A threshold issue is whether Detective Ovalle and Officer Gomillion had reasonable suspicion for the *Terry* stop of Defendant Smith. As was mentioned above, under *Terry*, a police officer whose observations lead him to reasonably suspect that a particular individual has committed, is committing, or is about to commit a crime may detain that person briefly in order to investigate the circumstances that provoked suspicion. 392 U.S. at 21-22, 30. To proceed from a stop to a frisk, the police officer must reasonably suspect that the person stopped is armed and dangerous. *Johnson*, 129 S.Ct. at 784.

Before his flight, the officers did not have reasonable suspicion for temporarily detaining Defendant Smith based upon his arguing with Banks. At the time Detective Orvalle first saw Smith,

Case No. 1:09-CR-77
Gwin, J.

Smith and Banks were 50 to 70 yards away from him and nothing suggested that Smith was assaulting her. After Smith saw Detective Orvalle over 50 yards away, he, Banks and the woman walked calmly away. Based upon what Detective Orvalle knew at this time, no reasonable suspicion existed that Smith had committed or had threatened to commit a crime.

The video feed of the argument indicates, however, that the Defendant saw the officers approaching and immediately turned to walk away from them and toward the apartment building, as opposed to waiting to speak with the officers and to answer their questions. Although there is some question regarding the credibility of the officers, particularly their assertions that they repeatedly told the Defendant to stop, the Defendant did ignore the officers, run up the stairs, and attempt to enter Banks's apartment, at which point the officers approached him and he touched his waistband as if to reach for a gun.[3] Thus, while no reasonable suspicion supported stopping Defendant Smith outside in the courtyard, a number of factors supported the presence of reasonable suspicion when the Detective Ovalle came upon Smith outside Banks's apartment. The totality of the circumstances leads the Court to believe that the officers did have reasonable suspicion for their *Terry* stop of the Defendant when Detective Ovalle came to the area outside apartment 144.

B. *Timing of the Stop, Seizure, and Arrest of the Defendant*

Even though Detective Ovalle and Officer Gomillion had reasonable suspicion for the *Terry* stop of Defendant Smith when they came upon him outside apartment 144, the Court must examine whether the officers exceeded the scope of the temporary detention or seizure permitted by *Terry* by transforming it into an arrest through their actions. The Defendant argues that his arrest was

---

[3] At this point, with the Defendant cornered in a hallway, the officers reasonably could have believed that the Defendant was armed and dangerous, necessitating a frisk.

Case No. 1:09-CR-77
Gwin, J.

unconstitutional because the officers did not have probable cause at the time that they "seized" and arrested him. The Court determines, however, that the Defendant's detention was temporary for the purposes of the Fourth Amendment and that his seizure at the time that the officers actually handcuffed him was not incident to an arrest. The Court also determines that the temporary "seizure" did not transform into an arrest, necessitating probable cause, because the officers handcuffed the Defendant or because they took the Defendant downstairs and outside to conduct the pat-down.

The Supreme Court has held that a "person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, 'by means of physical force or show of authority,' terminates or restrains his freedom of movement, '*through means intentionally applied*.'" Brendlin v. California, 127 S.Ct. 2400, 2405 (2007). Put another way, a seizure occurs if "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." United States v. Mendenhall, 446 U.S. 544, 554 (1980).

Because an "arrest requires *either* physical force . . . *or*, where that is absent, *submission* to the assertion of authority," California v. Hodari D., 499 U.S. 621, 626 (1991), a seizure does not occur when a police officer yells out "'Stop, in the name of the law!'" at a fleeing form that continues to flee," *id.*, or the defendant otherwise refuses to yield to the authority of the police.

In light of the abovementioned case law, Defendant Smith was not seized at the time that Detective Ovalle and Officer Gomillion may have yelled for him to stop because he did not yield to their authority and proceeded into the apartment building and up the stairs to Banks's apartment. The officers only seized Defendant Smith for the purposes of the *Terry* stop when they handcuffed him at the top of the landing outside of apartment 144.

Case No. 1:09-CR-77
Gwin, J.

Further, this temporary seizure of Defendant Smith did not transform to a seizure incident to an arrest, necessitating a finding of probable cause, just because the officers handcuffed the Defendant. Courts have frequently determined that using handcuffs in conjunction with performing a *Terry*-type frisk is an appropriate precautionary procedure, as it is the method that best protects the officer's safety. *United States v. Tilmon*, 19 F.3d 1221, 1228 (7th Cir. 1994) ("When a suspect is considered dangerous, requiring him to lie face down on the ground is the safest way for police officers to approach him, handcuff him, and finally determine whether he carries a weapon."); *see also United States v. Hurst*, 228 F.3d 751, 758 n. 3 (6th Cir. 2000).

The Supreme Court has also recognized the propriety of police officers' use of protective measures to prevent subjects of *Terry* stops from accessing weapons. *See Michigan v. Long*, 463 U.S. 1032, 1051-52 (1982). The *Terry* Court held that a *Terry* investigation is, by its nature, conducted "at close range," *Terry*, 392 U.S. at 24, and that the officer is often required to make a "quick decision as to how to protect himself and others from possible danger," *id.* at 28. The Court has also held that law enforcement officers cannot be required to "decide instantaneously what 'less intrusive' alternative exists to ensure that any threat presented by the suspect will be neutralized." *Long*, 463 at 1053 n. 16; *see also United States v. Sharpe*, 470 U.S. 675, 686-87 (1985). In evaluating the reasonableness of police conduct undertaken in the context of a "swiftly developing" *Terry*-type situation, the Court has accordingly counseled that reviewing courts must refrain from indulging in "unrealistic second-guessing." *Id.* at 686.

Moreover, the officers did not exceed their authority under *Terry*, transforming the temporary stop of Defendant Smith into a seizure incident to an arrest, by walking the Defendant downstairs and outside prior to patting him down. Courts have held that some movement of the suspect in the

-12-

Case No. 1:09-CR-77
Gwin, J.

general vicinity of the *Terry* stop is permissible without converting what would otherwise be a temporary seizure into an arrest. *See United States v. Montano-Gudino*, 309 F.3d 501, 504 (8th Cir. 2002) (holding that the movement of the defendant from outside a storage facility into one of the rooms of the building constituted a proper temporary seizure); *United States v. $109,179 in U.S. Currency*, 228 F.3d 1080, 1085 (9 Cir. 2000) (concluding that moving a defendant a short distance to another room was part of a proper temporary seizure and holding that neither "handcuffing a suspect nor relocating a suspect automatically turns a detention into an arrest where these actions are reasonably taken for safety and security purposes"); *United States v. Pino*, 855 F.2d 357, 362 (6th Cir. 1988) (determining, in the context of a traffic stop – a "species of investigative detention" under *Terry* – that ordering an individual to move his car from the side of the highway to the interstate underpass was not "more intrusive than necessary to fulfil the purposes of the stop").

In this case, the officers testified that when they observed Defendant Smith reaching for his waistband, they were in fear for their safety. They decided to walk the Defendant downstairs and outside prior to conducting the pat-down to minimize the potential risks associated with conducting a search of the Defendant in a hallway outside the apartment that he was attempting to enter and to alert other officers to their location. Had they stayed in this location outside apartment 144, the officers could have had to subdue the Defendant while potentially dealing with the other occupants of the apartment complex such as the Defendant's friends and neighbors and they could have potentially faced a dangerous situation while situated in very tight quarters. Thus, given the minimal nature of the Defendant's movement and the limited time of his detention prior to the pat-down, the Court determines that the officers' seizure of the defendant was temporary and was not transformed into a seizure incident to an arrest that exceeded the scope of a lawful *Terry* stop when the officers

Case No. 1:09-CR-77
Gwin, J.

handcuffed and moved the Defendant for their own safety.

As a result, the Court determines that the *Terry* stop of Defendant Smith was lawful and the officers did not exceed the scope of their authority under *Terry*. The Court therefore denies the motion to suppress the evidence and statements [4] resulting from the stop.

### IV. Conclusion

For the foregoing reasons, the Court **DENIES** Defendant Smith's motion to suppress evidence and statements.

IT IS SO ORDERED.

Dated: March 31, 2009                           s/        *James S. Gwin*
                                                JAMES S. GWIN
                                                UNITED STATES DISTRICT JUDGE

---

[4] Because the search of the defendant was lawful and reasonable under the circumstances and the Defendant's made statements freely and voluntarily both prior to and following the recitation of his Miranda rights, the suppression of the Defendant's statements is unwarranted.